IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

EDITH M. BENNETT,　　　　　　　　　　)
　　　Plaintiff,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　　　　)　　　Civil No. 3:17cv835 (MHL)
　　　　　　　　　　　　　　　　　　　　　)
NANCY A. BERRYHILL,　　　　　　　　　)
Acting Commissioner of Social Security,　　)
　　　Defendant.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)

## REPORT AND RECOMMENDATION

On January 10, 2014, Edith Bennett ("Plaintiff") applied for Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from heart disease, hypertension, chronic obstructive pulmonary disease ("COPD"), diabetes, depression, high cholesterol and arthritis, with an alleged onset date of May 7, 2007. The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in (1) affording little and some weight to the opinions of Plaintiff's treating nurse practitioner and (2) assigning limited weight to the 2012 residual functional capacity ("RFC") determination of ALJ Donna Dawson ("ALJ Dawson"). (Mem. in Support of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 15-1) at 1.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties'

cross-motions for summary judgment, rendering the matter ripe for review.[1]  For the reasons that

follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 15) be

DENIED, that Defendant's Motion for Summary Judgment (ECF No. 22) be GRANTED and

that the final decision of the Commissioner be AFFIRMED.

## I.   PROCEDURAL HISTORY

On January 10, 2014, Plaintiff filed an application for SSI with an alleged onset date of

May 7, 2007.  (R. at 209-214.)  The SSA denied Plaintiff's application both initially, on April 16,

2014, and upon reconsideration, on September 22, 2014.  (R. at 125, 140.)  At Plaintiff's written

request, the ALJ held a hearing on June 20, 2016.  (R. at 40-72, 147-49.)  On August 2, 2016, the

ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not

qualify as disabled under the Act, because she could perform jobs existing in significant numbers

in the national economy.  (R. at 10-20.)  On October 18, 2017, the Appeals Council denied

Plaintiff's request for review, rendering the ALJ's decision as the final decision of the

Commissioner subject to review by this Court.  (R. at 1-3.)

## II.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

Social Security Administration's disability determination 'when an ALJ has applied correct legal

standards and the ALJ's factual findings are supported by substantial evidence.'"  *Mascio v.*

*Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

---

[1]     The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc.
R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal
identifiers such as Plaintiff's social security number, the names of any minor children, dates of
birth (except for year of birth), and any financial account numbers from its consideration of
Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to
only the extent necessary to properly analyze the case.

337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).  To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists.  20 C.F.R. § 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation).  To summarize, at step

one, the ALJ looks at the claimant's current work activity. § 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can do despite her physical and mental limitations. § 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 416.920(a)(4)(v).

## III.    THE ALJ'S DECISION

On June 20, 2016, the ALJ held a hearing, during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 40-72.) On August 2, 2016, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 19-20.)

The ALJ followed the five-step evaluation process established by the SSA in analyzing Plaintiff's disability claim. (R. at 13-19.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 13, 2013 her application date. (R. at 13.) At step two, the ALJ found that Plaintiff suffered from the severe impairments of coronary artery disease, diabetes mellitus with neuropathy[2] and COPD. (R. at 13-14.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or

---

[2]      Neuropathy denotes "a functional disturbance or pathological change in the peripheral nervous system." In patients with diabetes mellitus, neuropathy often begins in the lower limbs. *Neuropathy*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 14-15.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform light work as defined in 20 C.F.R. § 416.967(b), except that Plaintiff could perform only simple routine tasks in an inside environment without excessive cold, heat, humidity, smoke or poor ventilation. (R. at 15.) Plaintiff further required fifteen minutes of rest every two hours and a sit/stand option in place two minutes every hour. (R. at 15.) The ALJ estimated that Plaintiff would be off task ten percent of the time and miss twelve days of work per year. (R. at 15.) And the ALJ found that Plaintiff could never perform production work on an assembly line. (R. at 15.)

Given Plaintiff's RFC, at step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (R. at 18.) However, at step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 18.) Accordingly, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 19.)

IV.    ANALYSIS

Plaintiff, fifty-four years old at the time of this Report and Recommendation, previously worked as a factory associate and retail cashier. (R. at 222, 227.) She applied for SSI, alleging disability from heart disease, hypertension, COPD, diabetes, depression, high cholesterol and arthritis, with an alleged onset date of May 7, 2007. (R. at 222, 226.) Plaintiff's appeal to this Court alleges that the ALJ erred in affording little and some weight to the medical opinions of Plaintiff's treating nurse practitioner and limited weight to the prior 2012 RFC determination of ALJ Dawson. (Pl.'s Mem. at 1.)   For the reasons set forth below, the ALJ did not err in his decision.

A.    **The ALJ Afforded Proper Weight to the Opinions of Plaintiff's Treating Nurse Practitioner.**

Plaintiff first argues that the ALJ erred in affording little weight to the opinion of Renee Hammel, N.P. ("Nurse Hammel"). (Pl.'s Mem. at 1.) Defendant responds that substantial evidence supports the ALJ's assignment of weight. (Def.'s Mot. Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 22) at 22.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 416.912, 416.927.  When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.  § 416.927(c).  If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved.  §§ 416.927(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight.  SSR 06-3p.[3]  Acceptable medical

---

[3]      Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. § 416.927(f).  82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017).  Plaintiff filed her claim on January 10, 2014, before this regulation took effect. (R. at 209.)  The Agency does not have the power to engage in retroactive rulemaking.  *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules,

sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability.  §§ 416.913(a), 416.927(a).  The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists.[4]  § 416.913(d).

Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. § 416.927(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.  Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported.  §§ 416.927(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistencies.'"  *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).  Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded.  *Id.*

---

but not granting retroactive rulemaking power).  Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[4]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. § 416.913(a).  The given examples constitute a non-exhaustive list.

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors. § 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. § 416.927(d)(1). Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

As a nurse practitioner, Nurse Hammel constitutes an "other source." SSR 06-3p. Therefore, an ALJ could assign as much or as little weight to Nurse Hammel's opinions as deemed appropriate, so long as the ALJ considered the opinions in some way. § 416.913(d). Here, after analyzing the § 416.927(c) factors, the ALJ evaluated and assigned little weight to Nurse Hammel's opinion as to Plaintiff's physical limitations and some weight to Nurse Hammel's opinion as to Plaintiff's mental capacity. (R. at 17.)

Nurse Hammel personally treated Plaintiff on five occasions over the course of a year. (R. at 1324, 1335, 1342, 1346, 1351.) During her second meeting with Plaintiff, Nurse Hammel completed Plaintiff's disability paperwork and opined about Plaintiff's physical and mental limitations. (R. at 938-39, 941-43, 1349.) In her physical assessment, Nurse Hammel reported that Plaintiff had limitations in her ability to repetitively reach, handle and finger. (R. at 939.) In Nurse Hammel's estimation, Plaintiff could never lift more than twenty pounds and only occasionally lift ten pounds, and Plaintiff could grasp, turn or twist objects and perform fine manipulation with her fingers only twenty percent of the time. (R. at 939.) Nurse Hammel

indicated that Plaintiff could stand/walk for a total of one hour and sit for a total of one hour in an eight-hour workday, standing/walking or sitting for no more than five minutes at a time. (R. at 938.) Nurse Hammel further opined that Plaintiff would need a five-minute break from work every ten to fifteen minutes and would likely be absent from work three or four times each month. (R. at 938-39.)

In her Mental Capacity Assessment, Nurse Hammel diagnosed Plaintiff with anxiety. (R. at 941.) Based on her diagnosis, on a scale of unknown to extreme limitations, Nurse Hammel recorded that Plaintiff had slight limitations in her ability to remember and understand locations, work-like procedures and both simple and detailed instructions. (R. at 941.) Nurse Hammel opined that Plaintiff had no limitations in her ability to carry out very short and simple instructions and slight limitations in her ability to maintain regular attendance and punctuality. (R. at 941.) As far as Plaintiff's capacity to concentrate, Nurse Hammel recorded slight limitations in Plaintiff's ability to work without distraction and otherwise noted no limitation in Plaintiff's ability to make simple, work-related decisions. (R. at 942.) Socially, Nurse Hammel estimated that Plaintiff would have no limitations in her ability to interact with the public, ask simple questions or request assistance, and Nurse Hammel believed that Plaintiff could maintain socially appropriate behavior. (R. at 942.) Nurse Hammel further opined that Plaintiff would have slight limitations in using public transportation or traveling to unfamiliar places. (R. at 943.) Ultimately, Nurse Hammel concluded that Plaintiff could manage her benefits in her own best interest. (R. at 943.)

The ALJ assigned Nurse Hammel's opinion on Plaintiff's physical limitations little weight after finding that her opinion proved "inconsistent with the objective findings on examinations and diagnostic tests, the lack of evidence regarding upper extremity limitations,

and the claimant's admitted daily activities . . . ." (R. at 17.)  Additionally, the ALJ found that
the evidence of record did not support Nurse Hammel's conclusions on the frequency of
Plaintiff's breaks and work absences.  (R. at 17.)  However, the ALJ assigned some weight to
Nurse Hammel's opinion on Plaintiff's slight mental limitations, finding that Nurse Hammel's
assessment considered the whole of Plaintiff's symptoms and impairments.  (R. at 17-18.)
Substantial evidence supports the ALJ's assignment of weight.

     **1.**     **Nurse Hammel's Opinions Proved Inconsistent with Her Own Treatment Records.**

     Nurse Hammel first treated Plaintiff on February 13, 2015, at Crossover Clinic
("Crossover").  (R. at 1351.)  Plaintiff complained of migraines, pain all over and peripheral
neuropathy in her feet.  (R. at 1351.)  She also requested that Nurse Hammel complete Plaintiff's
disability paperwork.  (R. at 1351.)  Nurse Hammel's examination, besides mentioning a swollen
nose, made no remarkable findings and noted clear lungs, normal heartrate and full range of
motion in Plaintiff's neck.  (R. at 1351.)  Nurse Hammel further observed that Plaintiff appeared
to be in no acute distress and generally well developed.  (R. at 1351.)  Ultimately, Nurse
Hammel diagnosed Plaintiff with migraines, peripheral neuropathy and depression, and adjusted
Plaintiff's medications accordingly.  (R. at 1351-52.)

     On March 4, 2015, Plaintiff returned to Crossover solely to obtain disability paperwork.
(R. at 1349.)  During this appointment, Nurse Hammel completed Plaintiff's Physical Residual
Functional Capacity Assessment, (R. at 938-39), and Mental Capacity Assessment, (R. at 941-
43), discussed above.

     Plaintiff returned for her scheduled routine physical assessment with Nurse Hammel on
March 27, 2015, complaining of ear and tooth pain.  (R. at 1346.)  Nurse Hammel observed a
broken tooth and swollen gums, but no bleeding or pus.  (R. at 1346.)  Nurse Hammel further

reported that Plaintiff appeared in no acute distress, well developed and well nourished. (R. at 1346.)

On June 19, 2015, Nurse Hammel saw Plaintiff again for a follow-up appointment. (R. at 1342-43.) Plaintiff complained that her Maxalt prescription failed to alleviate her migraine symptoms. (R. at 1342.) On examination, Nurse Hammel again noted broken teeth, but also observed that Plaintiff had a normal heart rate and clear lungs. (R. at 1343.) Plaintiff appeared in no acute distress and well developed, though Nurse Hammel mentioned that Plaintiff's difficult living situation likely stressed her. (R. at 1342-43.) Because of these observations, Nurse Hammel adjusted Plaintiff's Maxalt medication and referred her to a social worker for financial assistance and help with her disability paperwork. (R. at 1343.)

Plaintiff revisited Nurse Hammel on August 19, 2015, complaining of a small ulcer on her lower leg. (R. at 1335.) The ulcer had grown to two square millimeters in size. (R. at 1335.) Plaintiff otherwise appeared in no acute distress, with full range of motion in her neck. (R. at 1335.) Nurse Hammel treated the leg ulcer with an antibiotic. (R. at 1335.) On September 18, 2015, Plaintiff returned to Crossover, complaining of dizziness, headaches and nausea. (R. at 1324-25.) On examination, Nurse Hammel noted that Plaintiff had coarse and diminished breathing sounds, as well as a slight inspiratory wheeze. (R. at 1325.) Otherwise, the examination proved unremarkable, as Plaintiff had normal range of motion, sensation, extremity strength and heart rate. (R. at 1325.) Plaintiff also had a full range of motion in her back and no clubbing, discoloration or swelling in her extremities. (R. at 1325.) Ultimately, Nurse Hammel slightly adjusted Plaintiff's medications to treat her headaches. (R. at 1326.)

Plaintiff attended a meeting with a social worker on September 23, 2015, though both agreed that Plaintiff no longer needed social work meetings. (R. at 1320.) Instead, Plaintiff

would continue biweekly counseling. (R. at 1320.) On February 23, 2016, Nurse Hammel noted that Plaintiff no-showed to all subsequent appointments with her. (R. at 1314.) Plaintiff did call Crossover multiple times, but only to request additional medication and an oral surgery referral. (R. at 1306, 1309, 1311, 1313.) Despite Plaintiff's no-shows, Nurse Hammel occasionally agreed to refill some of Plaintiff's prescriptions. (R. at 1311.)

As the ALJ noted, Nurse Hammel's opinion on Plaintiff's physical capabilities proved inconsistent with Nurse Hammel's own treatment notes. Indeed, although Nurse Hammel's physical limitations assessment indicated that Plaintiff had limited fine motor skills and exertional abilities, (R. at 939), before filling out Plaintiff's disability paperwork, Nurse Hammel herself made no observations regarding Plaintiff's strength or motor skills, (R. at 1351-52.) In fact, after completing her physical assessment of Plaintiff, on September 18, 2015, Nurse Hammel observed that Plaintiff's extremities had no clubbing, discoloration or swelling, and noted that Plaintiff had a full range of motion in her musculoskeletal system. (R. at 1325). And Nurse Hammel specifically observed that Plaintiff had normal strength in her extremities. (R. at 1325.)

Furthermore, as the ALJ noted, Nurse Hammel's medical observations do not support her speculation regarding the frequency with which Plaintiff would miss work or need breaks. (R. at 17.) Nurse Hammel opined that Plaintiff would need a five-minute break from work every ten to fifteen minutes. (R. at 938.) She also stated that Plaintiff likely would be absent from work three or four times each month. (R. at 939.) However, the assessment contains no written explanation of how Plaintiff's symptoms ("shortness of breath, easily fatigued" and "constant feet/leg pain") directly support Nurse Hammel's specific predictions. (R. at 938-39.) Indeed, during her one appointment with Plaintiff before completing her disability assessment, Nurse

12

Hammel reported that Plaintiff appeared in good health except for a swollen nose. (R. at 1351.) And, during a later appointment, Nurse Hammel wrote that Plaintiff had full range of motion in her back and normal motor strength in her arms and legs. (R. at 1325.) Nurse Hammel's mental assessment of Plaintiff also noted only a slight limitation in Plaintiff's ability to maintain regular attendance and punctuality. (R. at 941.)

Nurse Hammel's treatment notes further support the ALJ's decision to assign "some weight" to Nurse Hammel's mental capacity assessment. (R. at 17.) On a scale of unknown to extreme limitation, Nurse Hammel's mental assessment indicated that Plaintiff suffered only slight limitations in her ability to understand and remember instructions, maintain a schedule, work without distraction and travel to unfamiliar places. (R. at 941-43.) Nurse Hammel's notes either concur with those findings or suggest greater mental capabilities than Nurse Hammel endorsed. Indeed, Nurse Hammel repeatedly observed that Plaintiff appeared in no acute distress, (R. at 1325, 1335, 1343, 1346, 1351), and also described Plaintiff as alert, oriented and cooperative, (R. at 1325). When Plaintiff appeared stressed, moreover, Nurse Hammel treated Plaintiff conservatively with recommended social work counseling that Plaintiff later discontinued. (R. at 1320, 1342.) Nurse Hammel's own treatment notes therefore support the ALJ's decision to assign some weight to her mental health assessment of Plaintiff.

### 2.  The Objective Medical Evidence Supports the ALJ's Assignment of Weight to Nurse Hammel's Opinions.

The ALJ's assignment of weight to Nurse Hammel's opinions finds further support in Plaintiff's longitudinal medical record. For instance, Plaintiff received conservative treatment from other care providers at Crossover. (R. at 736-54.) Indeed, Plaintiff's treatment notes from her first visits to Crossover in 2011 indicate that Prozac successfully managed Plaintiff's anxiety. (R. at 751.) Plaintiff's September 2012 treatment notes also indicate that she received a

conservative treatment of prescription drugs to treat her symptoms. (R. at 745.) And a record from an April 2013 appointment shows that physicians recommended an inhaler to treat Plaintiff's COPD and medications to treat Plaintiff's complaints of pain. (R. at 738.) Plaintiff's other medical records further demonstrate that Plaintiff had greater physical abilities than Nurse Hammel endorsed, and somewhat concur with a finding of slight mental limitation, providing substantial evidence to support the ALJ's assignment of weight to Nurse Hammel's opinions.

On February 16, 2012, Plaintiff first presented to Chippenham Hospital with complaints of abdominal pain, though she denied constipation, diarrhea, nausea or fever. (R. at 945.) Although an angiography showed that Plaintiff had calcification in her abdominal vessels, radiologists recommended no intervention at that time. (R. at 945.) Otherwise, Plaintiff's attending physician, Michael A. Perini, M.D., observed that Plaintiff had no clubbing, discoloration or swelling in her extremities. (R. at 948-49.) He also recorded that Plaintiff had a normal heart rate and clear lungs, though he noted diminished breathing sounds and that Plaintiff smoked a half-pack of cigarettes each day. (R. at 948.) Approximately ten days later, another attending physician, Matthew Cohen, M.D., observed no wheezes, rales or coarseness in Plaintiff's breathing. (R. at 951-52.) Plaintiff's physicians discharged her in good condition. (R. at 945.)

Plaintiff presented to Chippenham Hospital again on July 10, 2012, with complaints of chest and abdominal pain and diarrhea. (R. 965, 967.) Plaintiff's doctors treated her with pain management and medications. (R. 965.) Her attending physician, Gauri Aggarwal, M.D., recorded that Plaintiff appeared in no acute distress, alert and oriented, with clear lungs, a normal heart rate and no clubbing, discoloration or swelling in her extremities. (R. at 968-69.) A stress test revealed an abnormal pulse in the apex of Plaintiff's heart, which physicians determined not

14

to be the cause of her chest pain.  (R. 965.)  An examination of Plaintiff's esophagus and stomach by Henry Ellett, M.D., revealed gastritis and an antral ulcer on Plaintiff's esophagus,[5] though the ulcer appeared to be healing.  (R. at 976-77.)  Plaintiff's doctors otherwise noted no abnormalities.  (R. at 968.)

On August 29, 2012, Plaintiff revisited Chippenham Hospital for chest pain.  (R. at 991.)  Plaintiff denied abdominal pain, diarrhea or constipation.  (R. at 994-95.)  Doctors diagnosed Plaintiff with strep throat, which they treated with antibiotics.  (R. at 991.)  Plaintiff's physicians then discharged her with full medical clearance, though she remained at the hospital for over fifteen days for a two-week antibiotic course.  (R. at 991.)  On physical examination, Hitesh Keshavbhai, M.D., observed no respiratory distress but noted that Plaintiff had coarse breathing in both of her lungs.  (R. at 994.)  Dr. Keshavbhai further noted that Plaintiff's heart rate had no gallop or murmurs and that her legs showed no swelling or tenderness.  (R. at 994.)  Another attending physician, Charles Evans, M.D., also found that Plaintiff had no joint deformities.  (R. at 997-98.)  Dr. Evans predicted that excessive coughing — not heart disease — likely caused Plaintiff's chest pain.  (R. at 996-97.)  Notably, Plaintiff's physicians believed that Plaintiff had a "secondary gain" for being in the hospital, as she was reluctant to leave.  (R. at 991-92.)

On January 13, 2013, Plaintiff treated at Chippenham Hospital for chest pain.  (R. at 1010.)  During her hospital stay, Plaintiff received bare metal stenting in her right coronary artery and left anterior descending coronary artery.  (R. at 1010.)  Plaintiff also received a coronary angioplasty in addition to the stent in her left anterior descending artery.[6]  (R. at 1017-

---

[5]      Patients with gastritis experience inflammation of the stomach.  *Gastritis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[6]      An angioplasty denotes a procedure whereby physicians use a balloon-like structure to widen narrowing blood vessels.  *Angioplasty*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

18.)  Plaintiff's symptoms improved following these procedures.  (R. at 1010.)  Charles Joyner, M.D., performed Plaintiff's physical examination and noted clear lungs, a regular heart rate and mental alertness, but trace swelling in Plaintiff's legs.  (R. at 1013-14.)  Dr. Joyner also observed normal leg muscle bulk and no joint swelling or looseness.  (R. at 1013.)  An examination of Plaintiff's esophagus and stomach revealed normal esophageal health but some erosion in the stomach indicative of gastritis.  (R. at 1021.)  The Hospital discharged Plaintiff on January 25, 2013, in good health and with adjusted medication.  (R. at 1010-11.)

On February 1, 2013, Plaintiff presented to Chippenham Hospital, complaining of chest pain.  (R. at 406.)  Her physical examination proved unremarkable.  (R. at 407, 1050.)  Plaintiff's consulting physician, Earl Diehl, M.D., observed a clear chest and regular heart rate.  (R. at 1050-51.)  He also stated that Plaintiff moved all extremities well.  (R. at 1050.)  After cardiac catheterization, Plaintiff's physicians found no indication of acute coronary syndrome or heart attack.  (R. at 427.)  Additionally, Plaintiff denied joint pain, chest pain, shortness of breath, anxiety and depression.  (R. at 1054.)  Calvin Newton, M.D., believed that moderate bleeding in Plaintiff's retroperitoneal cavity — stable at the time of discharge — caused Plaintiff's discomfort.  (R. at 1044-45.)  Plaintiff's physicians discharged her on February 7, 2013, with a stable cardiac status and adjusted medications.  (R. at 404-05.)

Plaintiff next presented to Chippenham Hospital on March 11, 2013, with complaints of chest and abdominal pain.  (R. at 563.)  Ruksana Jabeen, M.D., determined that Plaintiff's chest pain appeared atypical and ruled out acute coronary syndrome as the cause.  (R. at 586.)  As for Plaintiff's complaints of abdominal pain, Venkataraman Santosh, M.D., observed no significant abnormalities in Plaintiff's abdomen.  (R. at 563.)  During her stay, Plaintiff's physicians

discovered a regressing hematoma of unclear cause,[7] though they advised no surgical intervention. (R. at 586.) On physical examination, Dr. Santosh observed that Plaintiff had clear lungs and a regular heart rate. (R. at 564.) Ultimately, Plaintiff's physicians diagnosed her with hepatic steatosis,[8] obesity, type II diabetes, dyslipidemia,[9] stable COPD and hypertension. (R. at 586.) Dr. Shabeen adjusted Plaintiff's medications and discharged her in a stable condition on March 13, 2013. (R. at 587.)

Plaintiff returned to Chippenham Hospital on March 24, 2013, citing left-sided chest pain. (R. at 591.) A cardiac catheterization showed some small vessel disease that Mark Newton, M.D., opined had not caused Plaintiff's pain. (R. at 590.) Otherwise, Plaintiff maintained a stable cardiac condition with patent stents. (R. at 590.) Mark Digrazia, M.D., reported that Plaintiff had clear lungs, a normal heart rate and no swelling in her extremities. (R. at 592.) Upon discharge, Plaintiff seemed to be doing better but still experienced some "probably noncardiac" chest pain. (R. at 589-90.) Dr. Newton remarked that Plaintiff had failed to comply with medical therapy and suffered from chronic anxiety and depression. (R. at 589.)

Plaintiff arrived at Chippenham Hospital's emergency room on April 14, 2013, complaining of chest pains on her left-side and shortness of breath. (R. at 628.) Plaintiff also relayed that she had passed out from dizziness for several minutes during the previous day. (R. at 628.) However, Plaintiff's electrocardiogram ("EKG") proved consistent with previous

---

[7]     A hematoma denotes a "localized collection of blood, usually clotted, in an organ, space, or tissue, usually due to a break in the wall of a blood vessel." *Hematoma*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[8]     Hepatic steatosis denotes a fatty liver. *Steatosis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[9]     Patients with dyslipidemia experience abnormal levels of lipids and lipoproteins in their blood. *Dyslipidemia*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

17

recordings and her chest x-ray revealed no abnormalities. (R. at 629.)  On physical examination, Rujata Trivedi, M.D., reported that Plaintiff had normal respiration and heart rate, though she noted some swelling in Plaintiff's extremities. (R. at 629-30.)  Plaintiff's physicians believed that Plaintiff's low blood pressure caused her dizziness. (R. at 630.)  Plaintiff left the Hospital three days later with a diagnosis of atypical chest pain and orthostatic hypotension. (R. at 625.) Dr. Trivedi prescribed insulin to Plaintiff for her diabetes, inhalers for her COPD and antidepressants for her depression. (R. at 630.)  Dr. Trivedi further treated Plaintiff's chest pain with aspirin and statins. (R. at 630.)

On June 18, 2013, Plaintiff presented to Chippenham Hospital with chest pain. (R. at 649.)  Plaintiff underwent various angiography, stenting and catheterization procedures. (R. at 653.)  In performing those procedures, Michael Ball, M.D., reported no evidence of dying tissue in the heart muscle, (R. at 649, 653-54), though he diagnosed Plaintiff with three-vessel coronary disease, hypertension with no aortic stenosis and borderline elevated left ventricular diastolic pressure, (R. at 654).  Saumil Shah, M.D., performed Plaintiff's physical examination and noted a clear chest, regular heart rate, mild distress and no extremity swelling. (R. at 652.)  All procedures proved successful and Plaintiff left the Hospital in stable cardiovascular condition. (R. at 649.)  At her time of discharge, Plaintiff refused Accu-Cheks and blood draws. (R. at 649.)

On July 12, 2013, Plaintiff attempted suicide by taking ten trazodone tablets. (R. at 1115.)  Upon arriving at Chippenham Hospital, she received charcoal treatment and remained in-patient for three days. (R. at 1115.)  While in the emergency room, Plaintiff was briefly uncooperative due to distress and removed her fluid IVs while yelling at hospital staff. (R. at 1115.)  Khin Myint, M.D., performed Plaintiff's mental health examination, observing that

Plaintiff appeared "sick, disheveled, and sad." (R. at 1115.) Dr. Myint also observed that Plaintiff exhibited coherent speech and an alert and oriented disposition with goal-directed thought processes. (R. at 1115-16.) Plaintiff denied audiovisual hallucinations. (R. at 1115.) Dr. Myint adjusted Plaintiff's antidepressant medications and discharged her with a "brightened" mood and a stable mental condition, with no further suicidal ideation. (R. at 1116.)

Plaintiff next presented to Chippenham Hospital on October 21, 2013, with complaints of sharp chest pain that radiated to the back of her head. (R. at 1130.) She also reported shortness of breath but denied abdominal pain, headaches, coughing, nausea, dizziness or weakness. (R. at 1130-31.) Frank Ramsey, M.D., observed that Plaintiff had a high resting heart rate and mild distress, but normal heart sounds and no leg swelling. (R. at 1131-34.) Dr. Ramsey further noted that Plaintiff's breathing appeared normal, with no wheezes, rales or coarseness, and that she had full range of motion in her neck. (R. at 1132.) In terms of mental health, Plaintiff exhibited normal mood and affect. (R. at 1133.)

On February 7, 2014, Plaintiff treated at Chippenham Hospital, with complaints of lower chest pain that radiated to her back. (R. at 802.) She also reported dizziness, shortness of breath and nausea. (R. at 802.) Plaintiff's attending physician, John Ampomah, M.D., performed Plaintiff's physical examination, observing no cracking or wheezing in Plaintiff's breathing, no heart murmur or gallop, no foot swelling and an alert and oriented disposition. (R. at 802-03.) Dr. Ampomah further noted 98 percent oxygen saturation in Plaintiff's blood. (R. at 803.) After receiving medication, Plaintiff rested comfortably with no pain. (R. at 802.)

That same day, William Conrad, M.D., performed a chest x-ray that revealed likely atelectasis.[10] (R. at 842.) The x-ray also showed a heart size at the upper limits of normal. (R. at 842.) However, Dr. Conrad did not observe evidence of significant pulmonary vascular congestion, excess fluid, air in the chest cavity or abnormal bone structures. (R. at 842.) The next day, Plaintiff underwent a computed tomography ("CT") scan that revealed no evidence of aortic dissection, aneurysm or blockages in her pulmonary artery. (R. at 841.) However, an imaging study found persistent defects, scarring and a minimally restricted blood supply. (R. at 844.) In response, Plaintiff received a cardiac catheterization that revealed a stable coronary anatomy with only moderate coronary disease. (R. at 800, 811.) Plaintiff underwent an endoscopy on February 13, 2014, which indicated a normal esophagus with delayed gastric emptying. (R. at 800, 814.) Gabriel Paraschiv, M.D., diagnosed Plaintiff with gastroparesis, prescribed Erythromycin and discharged her. (R. at 800.)

Plaintiff visited Crossover on July 14, 2014. (R. at 1367-68.) Lisa Chaplin, N.P. ("Nurse Chaplin"), noted that Plaintiff had taken no medication for five to six months and had "not been to the clinic in over a year." (R. at 1367.) Plaintiff complained of tingling in both of her feet but had no other complaints, and she denied chest pain or other chest symptoms. (R. at 1367.) Nurse Chaplin mentioned Plaintiff's poor dental health, thinning hair, and coarse breathing. (R. at 1367-68.) Otherwise, Nurse Chaplin noted nothing concerning, adding that Plaintiff had no peripheral swelling and exhibited a pleasant mood. (R. at 1367-68.) Nurse Chaplin scheduled Plaintiff for multiple follow-up examinations and restarted her medications. (R. at 1368.)

---

[10] Patients with atelectasis suffer from the inability of a lung or a portion of a lung to fully expand. *Atelectasis*, <u>Dorland's Illustrated Medical Dictionary</u> (32d ed. 2012).

On September 14, 2014, Plaintiff arrived at Chippenham Hospital with chest pain and accompanying shortness of breath, nausea and dizziness. (R. at 1175.)  Kimberly Ball, M.D., performed Plaintiff's physical examination and noted that Plaintiff's condition appeared unremarkable, except for some chest pain. (R. at 1177.)  Dr. Ball recorded that Plaintiff had full range of motion in her extremities, oxygen saturation at 99 percent, a pleasant mood, regular heart rate and clear lungs with no wheezes, coarseness or crackles. (R. at 1177.)  A chest x-ray indicated that Plaintiff had a normal heart size and no definite evidence of acute cardiopulmonary process. (R. at 1182.)  Plaintiff stated that she felt pain throughout her hospital stay, though her physicians observed that she seemed comfortable. (R. at 1174.)  Plaintiff's attending physicians diagnosed her with atypical, noncardiac chest pain, uncontrolled diabetes, dental pain, hypertension, dyslipidemia, COPD, depression and tobacco dependence, but the Hospital discharged Plaintiff in stable condition. (R. at 1173-74.)  Upon discharge, Plaintiff indicated that she could not afford her medications and would not have her prescriptions filled, which would have cost her four dollars per month. (R. at 1174.)

Plaintiff revisited Chippenham Hospital on November 18, 2014, with lower back and flank pain. (R. at 1190.)  She denied any chest pain or shortness of breath. (R. at 1190.)  During Plaintiff's physical examination, Sheron Wyatt, M.D., reported that Plaintiff had a full range of motion in the right lower extremity, but she experienced tenderness in in her lumbar spine. (R. at 1191.)  Dr. Wyatt also noted that Plaintiff had 97 percent oxygen saturation on room air, regular heart rate, clear lungs with no wheezing or coarseness and no extremity swelling. (R. at 1191.)  Dr. Wyatt observed that Plaintiff had some mental discomfort but otherwise exhibited a pleasant mood and affect. (R. at 1191.)  A CT scan of Plaintiff's back evidenced a mild disc bulge at L3-L4 and L4-L5, but no other issues, and an abdominal CT scan revealed that Plaintiff had a non-

obstructing kidney stone. (R. at 1193-94.) Dr. Wyatt adjusted Plaintiff's medication and discharged her on November 19, 2014. (R. at 1188.) Although Plaintiff exhibited no leg weakness, Dr. Wyatt arranged for her to receive outpatient physical therapy and a walker. (R. at 1188.)

On January 25, 2015, Plaintiff arrived at Chippenham Hospital with chest pain. (R. at 1200.) Her physical examination and cardiac enzyme labs revealed nothing abnormal and Ashish Patel, M.D., noted that Plaintiff's chest pain did not appear to be typical of coronary artery disease. (R. at 1198, 1201.) On physical examination, Dr. Patel observed that Plaintiff had 98 percent oxygen saturation on room air, a normal heart rate, clear lungs, no leg swelling and full range of motion in her extremities. (R. at 1201.) Additionally, Plaintiff appeared in a normal mood and "not in any distress." (R. at 1201.) Plaintiff asked for pain medication "around the clock," though her attending physician ultimately elected to reduce her medication dosage after a long discussion. (R. at 1198.) After three days and a negative stress test, Plaintiff's physicians discharged her in a stable condition. (R. at 1198.)

Plaintiff treated at Chippenham Hospital on September 30, 2015, with complaints of chest pain and a headache. (R. at 1247.) Her physical examination revealed no abnormalities beyond a high resting heart rate. (R. at 1251.) Helen Dang, M.D., recorded that Plaintiff had 91 percent oxygen saturation on two liters of oxygen, normal heart rate, some expiratory wheezing, no swelling in her extremities and a normal mood. (R. at 1251.) Plaintiff's EKG remained unchanged from previous tracings and her stress test revealed a small defect but no cardiac issues. (R. at 1251.) Plaintiff received a cardiac catheterization and a CT scan of her head, which indicated sinusitis. (R. at 1247-48.) Ultimately, Padmalatha Dharanikota, M.D., discharged Plaintiff with improved chest pain and new medication. (R. at 1247.)

On October 9, 2015, Plaintiff presented to Chippenham Hospital with complaints of diffuse chest pain with associated nausea, shortness of breath, coughing and vomiting. (R. at 1269.) Plaintiff denied any pain in her extremities and flank. (R. at 1270.) Plaintiff's chest x-ray appeared normal and a CT scan indicated mild diverticulosis[11] but otherwise clear lungs and no vascular abnormality. (R. at 1277, 1281.) Radiological studies confirmed that Plaintiff's heart and lungs appeared normal. (R. at 1282.) Imani Orgill, M.D., observed that Plaintiff had no respiratory distress, normal heart sounds and no leg swelling, though Plaintiff demonstrated tearful anxiety. (R. at 1269, 1273.) Cary Straton, M.D., discharged Plaintiff in a stable condition, noting that Plaintiff appeared disappointed that she did not receive narcotic pain medication. (R. at 1278.)

Finally, on January 18, 2016, Plaintiff presented to Chippenham Hospital's emergency room, with complaints of left-sided chest pain. (R. at 1291.) Upon intake, Plaintiff's cardiac markers proved unremarkable, but the Hospital admitted her to rule out acute coronary syndrome. (R. at 1291.) Plaintiff's physical examination revealed no abnormalities, though she did ask for pain medication "constantly." (R. at 1292.) Dr. Dang recorded that Plaintiff had 90 percent oxygen saturation on room air, no respiratory wheezing, rales or crackles, no extremity swelling or clubbing and no heart murmur or gallop. (R. at 1292.) Plaintiff's radiological assessment uncovered no issues and her EKG indicated normal rhythm. (R. at 1297-1300.) Dr. Strato9 reported that Plaintiff had uncongested pulmonary vasculature, age appropriate lung expansion and no effusion or collection of air in the chest cavity, though Dr. Straton did observe

---

[11]      Diverticulosis describes the occurrence of pouches or sacs of variable size along the muscular coat of a tubular organ, such as the intestines. *Diverticulosis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

mild bronchitis. (R. at 1297.)  After receiving conservative treatment for bronchitis, Dr. Dang
discharged Plaintiff in stable condition and encouraged her to quit smoking.  (R. at 1288.)

As the ALJ correctly observed, Nurse Hammel's opinion on Plaintiff's physical
limitations lacked support from the objective medical evidence of record.  For example, although
Nurse Hammel indicated that Plaintiff suffered exertional and motor skill limitations, (R. at 939),
Plaintiff's attending physicians repeatedly described her extremities as healthy, with full range of
motion and no joint deformities or swelling, (R. at 407, 809, 948, 994, 997, 1013, 1132-33, 1177,
1191, 1292, 1295.)  Indeed, at no point did Plaintiff present herself for hospitalization due to
extremity issues, and she even denied such pain.  (R. at 1054 (denying joint pain), 1270 (denying
pain in her extremities and flank).)

Neither do Plaintiff's medical records support Nurse Hammel's conclusions that Plaintiff
would need a five-minute break from work every ten to fifteen minutes and would likely miss
work three or four times each month.  (R. at 938-39.)  Plaintiff's records reveal that she never
required aid to walk and that her physicians recommended physical therapy and a walker only
once during her four years of multiple hospitalizations.  (R. at 1188.)  Although Plaintiff
occasionally complained of leg pain, overwhelmingly her physicians noted no leg swelling, full
range of motion and no joint deformities.  (R. at 407, 809, 948, 994, 997, 1013, 1132-33, 1177,
1191, 1292, 1295.)  Plaintiff also received conservative treatment for her breathing difficulties,
and her breathing often showed improvement or stabilization.  (R. at 564, 629-30, 652, 803, 968,
991, 1177, 1201, 1281-82, 1288, 1292.)  Notably, Plaintiff failed to quit smoking throughout her
treatment, despite her doctors' advice.  (R. at 948-49 (noting that Plaintiff smoked a half-pack of
cigarettes a day and prescribing nicotine patch), 1173 (diagnosing Plaintiff with tobacco
dependence), 1288 (encouraging Plaintiff to quit smoking).)  And Plaintiff likewise received a

conservative treatment for her gastrointestinal issues.  (R. at 800.)  Plaintiff even refused

relatively inexpensive and nonintrusive treatments, suggesting that she did not suffer from the

severity of symptoms that she endorsed.  (R. at 649 (refusing blood draws and Accu-Cheks),

1174 (refusing four-dollar-per-month medications); *see also Dunn*, 607 F. App'x at 275-76

(holding that noncompliance with a treatment regimen can indicate a claimant's lack of

credibility as to the severity of his or her alleged symptoms).

As for Nurse Hammel's mental capacity assessment, Plaintiff's medical records either

concur with or contradict Nurse Hammel's conclusions, supporting the ALJ's decision to afford

her mental assessment some weight.  Indeed, although Plaintiff at times suffered from anxiety,

depression and suicidal ideation, her mental health generally improved or remained stable with

conservative treatment.  During Plaintiff's visits to Chippenham Hospital, Plaintiff's physicians

repeatedly described her as alert and oriented or with normal mood and affect.  (R. at 803, 968,

1133, 1177, 1191, 1201, 1251, 1367.)  Plaintiff even denied depression and anxiety on occasion.

(R. at 1054.)  And, when Plaintiff showed signs of depression or suicidal ideation, her physicians

treated her with medications, noting Plaintiff's improved mood after treatment.  (R. at 630,

1116.)

Considered in its entirety, Plaintiff's longitudinal medical record provides substantial

evidence to support the ALJ's assignment of little weight to Nurse Hammel's physical

limitations assessment and some weight to Nurse Hammel's mental capacity assessment.

### 3.    Plaintiff's Reported Daily Activities Provide Further Substantial Evidence to Support the ALJ's Assignment of Weight to Nurse Hammel's Opinions.

In affording little weight to Nurse Hammel's opinion on Plaintiff's physical limitations,

the ALJ found that Nurse Hammel's speculations proved "inconsistent with . . . [Plaintiff's]

admitted daily activities including her ability to take care of herself, her five young

grandchildren, and her household . . . ." (R. at 17.) Substantial evidence supports the ALJ's finding.

As part of her application for SSI, Plaintiff completed a function report, outlining her daily activities and abilities. (R. at 247.) In her report, Plaintiff denied taking care of any children or grandchildren. (R. at 248.) In terms of personal care, Plaintiff stated that she could dress, bathe and feed herself, maintain her hair and use the toilet without assistance, though she demurred that these activities could take her a while to complete. (R. at 248.) Around the house, Plaintiff reported that she cooked every day and could perform housework, though she required frequent breaks. (R. at 249.) Plaintiff also noted that she went on walks every day and shopped. (R. at 250.) To get around, Plaintiff stated that she did not drive and either walked or received rides from others. (R. at 250.) For leisure, Plaintiff affirmed that she visited friends, read and completed puzzle books. (R. at 251.) However, when visiting friends, Plaintiff declared that she felt "out of breath all the time." (R. at 252.)

In terms of her abilities, Plaintiff reported that her conditions affected her ability to lift, bend, stand, reach, walk, sit, kneel, talk and climb stairs, though Plaintiff denied limitations in her ability to squat, hear, see, remember, complete tasks, concentrate, understand and follow directions, use her hands and get along with others. (R. at 252.) Plaintiff estimated that she could lift no more than five pounds and needed to stop and rest after walking a few steps. (R. at 252.) Plaintiff asserted that she struggled less with non-physical activities and that she could cooperate with authority figures, handle changes in routine and follow instructions, though Plaintiff averred that she worried all of the time did not handle stress well. (R. at 252-53.)

Plaintiff also discussed her daily activities and abilities while testifying during her hearing before the ALJ. (R. at 45.) Plaintiff reiterated that she could lift no more than five

pounds, but Plaintiff also testified that she could lift her then twenty-pound grandson, albeit with some difficulty. (R. at 48-49.)  Plaintiff attested that she could take six or seven steps before needing a break and could sit for ten or fifteen minutes consecutively. (R. at 49.)  Contrary to her function report, in which she denied driving, Plaintiff further testified that she drove her daughter's vehicle to go grocery shopping. (R. at 50, 250.)  Plaintiff also confirmed that she could wash dishes, do laundry and vacuum regularly, though she had difficulty performing everyday tasks when she experienced migraines. (R. at 52-54.)  Notably, Plaintiff testified that, until approximately six months before her hearing, she had regularly taken care of her grandchildren, including a six-month-old baby, a three-year-old, a six-year-old, two eight-year-old twins, and a ten-year-old. (R. at 58-59.)  In caring for her grandchildren, Plaintiff averred that she sometimes had to take breaks but stated that she did her best. (R. at 58.)  Plaintiff ceased caring for her grandchildren because of nerves and a desire to move. (R. at 59.)

As the ALJ correctly noted, Nurse Hammel's medical opinion as to Plaintiff's physical capabilities conflicts with Plaintiff's admitted daily activities. (R. at 17.)  Nurse Hammel indicated that Plaintiff would be able to stand or walk for only one hour per workday in five-minute intervals, sit for one hour per workday in five-minute intervals and lift or carry up to ten pounds only occasionally. (R. at 938-39.)  However, Plaintiff attested that she shopped, cooked, cleaned and could generally take care of herself without assistance. (R. at 248-50.)  For some time, Plaintiff also cared for six grandchildren, even lifting her youngest grandchild, who weighed twenty pounds at the time. (R. at 58.)  Although Plaintiff demurred that these activities often proved exhausting and time-consuming, her overall testimony demonstrates greater physical abilities than Nurse Hammel endorsed.

27

Additionally, Plaintiff's stated daily activities conflicted with Nurse Hammel's assertions about Plaintiff's fine motor skills and exertional capacity. When applying for SSI, Plaintiff did not complain of any upper extremity pain, only pain in her "chest, back, legs, [and] head," (R. at 241), and Plaintiff further stated that her medical condition did not affect her ability to use her hands, (R. at 252.)

Neither did Plaintiff's admitted daily activities and abilities fully comport with Nurse Hammel's mental assessment of Plaintiff. Nurse Hammel opined that Plaintiff had slight limitations in her ability to understand and remember instructions, maintain a schedule, work without distraction and travel to unfamiliar places. (R. at 941-43.) However, Plaintiff's affirmations that she could work with others, handle changes in routine, concentrate and follow instructions undermine Nurse Hammel's conclusions — though Plaintiff's statements about her anxiety and stress support the ALJ's decision to afford Nurse Hammel's mental assessment some weight. (R. at 252-53.)

Considered together, Nurse Hammel's treatment notes, Plaintiff's longitudinal medical history and Plaintiff's own statements about her daily activities provide substantial evidence to support the ALJ's assignment of little weight to Nurse Hammel's opinion on Plaintiff's physical limitations. As for Plaintiff's mental limitations, the ALJ assigned some weight to Nurse Hammel's opinion given that it more holistically considered Plaintiff's impairments, which the record also supports. Accordingly, the ALJ did not err.

**B.** **The ALJ Properly Applied *Res Judicata* Principles to ALJ Dawson's Prior RFC Determination.**

Plaintiff next argues that the ALJ erred in applying *res judicata* principles to the prior RFC determination of ALJ Dawson. (Pl.'s Mem. at 24.) Specifically, in 2012, ALJ Dawson determined that Plaintiff could perform only sedentary work. (R. at 81.) Here, the ALJ

determined that Plaintiff could perform light work, assigning limited weight to ALJ Dawson's RFC findings after considering "the passage of time, submission of additional evidence, and [Plaintiff's] response to treatment[.]" (R. at 15.) Plaintiff argues that the ALJ assigned insufficient weight to ALJ Dawson's decision. (Pl.'s Mem. at 24.) Defendant responds that the ALJ appropriately assigned the prior RFC determination limited weight based on new evidence. (Def.'s Mem. at 27.)

When a claimant files an application for disability benefits after a previous denial of benefits, *res judicata* does not apply unless the claimant files an identical claim. *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476 (4th Cir. 1999). However, an ALJ must consider the findings made in a prior decision by an ALJ or the Appeals Council, assigning those findings "appropriate weight in light of all relevant facts and circumstances." AR 00-1(4), 2000 WL 43744, at *4. In determining the appropriate weight, the ALJ considers factors such as: (1) the prior finding's susceptibility to change with the passage of time; (2) the likelihood of such a change; and, (3) the extent that evidence not considered in the prior decision provides a basis for making a different finding in the subsequent claim. *Id.* Prior findings about facts such as a claimant's RFC or the severity of an impairment generally deserve less weight as the timeframe between claims increases. *Id.* In reviewing the weight assigned to a prior ALJ finding, the Court applies the substantial evidence test. *See Albright*, 174 F.3d at 477-78 (applying the substantial evidence rule rather than preclusion principles to a prior ALJ's decision).

Plaintiff filed applications for Disability Insurance Benefits ("DIB") and SSI on January 31, 2011, alleging disability beginning January 1, 2009. (R. at 76.) The SSA denied Plaintiff's applications both initially and upon reconsideration. (R. at 76.) On August 22, 2012, ALJ Dawson issued a written opinion, finding that Plaintiff could perform jobs existing in significant

numbers in the national economy. (R. at 86-87.) The Appeals Council declined to review ALJ Dawson's decision on November 26, 2012, (R. at 93), and Plaintiff filed no further appeals, (R. at 10). Here, the ALJ found that ALJ Dawson's decision proved final and binding through only November 26, 2012, the date of the Appeals Council's final decision, and afforded ALJ Dawson's RFC findings only limited weight. (R. at 10, 15.)

Although Plaintiff argues that the ALJ considered ALJ Dawson's RFC findings only in passing, (Pl.'s Mem. at 24-26), the ALJ did more than simply name the several factors outlined in the regulations, (R. at 15). Indeed, the ALJ went on to explain that additional records produced after ALJ Dawson's decision showed improvement in Plaintiff's coronary artery disease, COPD and diabetes. (R. at 16.) The ALJ also considered Plaintiff's testimony regarding her most recent daily activities, finding that the testimony evidenced less severe symptoms than Plaintiff endorsed. (R. at 17.) Substantial evidence supports the ALJ's findings.

In his decision, the ALJ found that Plaintiff's coronary heart disease had improved with treatment. (R. at 16.) The ALJ based his finding on the introduction of new evidence, largely pulled from Plaintiff's hospitalizations for chest pain in 2013, 2015 and 2016. (R. at 405, 1256, 1285.) Specifically, the ALJ heavily weighed the fact that Plaintiff had required no further stenting since 2013 and experienced no heart attacks since 2011, and that doctors had not recommended bypass surgery. (R. at 16, 653 (reporting stenting on June 18, 2013).) Indeed, in 2013, the year that Plaintiff last received her stents, she visited the hospital seven times complaining of chest pain. (R. 406, 563, 591, 628, 649, 1010, 1130.) On the other hand, Plaintiff visited the hospital with chest issues only twice in 2014 and three times in 2015. (R. at 802, 1175, 1198, 1247, 1269.) And, in 2016, Plaintiff had only one record of a hospital visit. (R.

at 1291.)  Further, Plaintiff's post-2012 medical records reveal that physicians often deemed

Plaintiff's chest pain atypical or noncardiac in nature.  (R. at 405, 589, 1173-74, 1256-57, 1282.)

The ALJ also considered new evidence regarding Plaintiff's COPD and found that her

lung condition had improved.  (R. at 16.)  Foremost, the ALJ noted that Plaintiff never required

hospitalization for breathing difficulties.  (R. at 16.)  Additionally, the ALJ observed that most of

Plaintiff's COPD symptoms correlated with other illnesses.  (R. 16.)  Indeed, Plaintiff's medical

records show that Plaintiff's respiration and lungs often appeared normal, and, as of 2016,

Plaintiff had 90 percent oxygen saturation on room air.  (R. at 449, 1047, 1054, 1095, 1119,

1177, 1229, 1289, 1292, 1343).  Additionally, Plaintiff consistently experienced only minimal

shortness of breath, often denying any shortness of breath altogether — despite continuing to

smoke a half-pack of cigarettes each day.  (R. at 417, 784-85, 967-68.)  When attending

physicians treated Plaintiff for breathing issues, it was typically due to an unrelated illness, such

as bronchitis.  (R. at 1288.)  Moreover, in her function report, Plaintiff mentioned breathing

issues only once, and only to indicate that she often became out of breath after doing physical

activities.  (R. at 252.)

Further, the ALJ noted that Plaintiff's diabetes mellitus had improved since ALJ

Dawson's decision.  (R. at 16-17.)  The ALJ noted that Plaintiff never required hospitalization

for her diabetes-related symptoms, complained only sporadically about her peripheral

neuropathy and often denied lower extremity pain.  (R. at 17.)  The ALJ also observed that

Plaintiff's muscle tone, strength, sensation and gait often appeared normal in her most recent

medical history.  (R. at 17.)  Plaintiff's medical records support the ALJ's findings.  For instance,

Plaintiff only sporadically complained of pain from peripheral neuropathy.  (R. at 241, 1254,

1295.)  When Plaintiff did expressly complain of related pain in her lower extremities, she noted

that her medication improved her condition.  (R. 54.)  And, on repeated physical examinations, Plaintiff's physicians recorded no abnormalities in her range of motion, motor function and sensation.  (R. at 1013, 1119, 1177, 1325.)

The ALJ also considered evidence that Plaintiff could take care of herself and others by performing daily activities that required some energy and mobility.  (R. at 17.)  Plaintiff stated that she could regularly perform housework, go shopping, drive a vehicle and prepare meals.  (R. 50, 54, 249.)  She also testified that she cared for her grandchildren full-time up to six months before her ALJ hearing, adding that she "had to sit down sometimes to take a break, but . . . did the best that [she] could."  (R. at 58.)

Ultimately, although ALJ Dawson concluded in 2012 that Plaintiff could perform only sedentary work with some postural and non-exertional limitations, subsequent evidence of improvements in Plaintiff's symptoms and abilities provided substantial evidence for the ALJ to reconsider Plaintiff's RFC and assign limited weight to ALJ Dawson's findings.  Accordingly, the ALJ did not err.

V.     CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 15) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 22) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to United States District Judge M. Hannah Lauck and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within**

32

fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 4, 2019